IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,712

STATE OF KANSAS,
*Appellee*,

v.

TYRONE WALKER,
*Appellant*.

SYLLABUS BY THE COURT

1.

When a defendant challenges the district court's failure to give a lesser included offense instruction for the first time on appeal, the defendant must demonstrate that the failure was clearly erroneous, *i.e.*, the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.

2.

In determining whether a prosecutor erred during closing argument, an appellate court first decides whether the comments were outside the wide latitude a prosecutor is allowed in discussing the evidence. While a prosecutor may not make inflammatory statements to the jury or use repugnant imagery, he or she may use graphic speech to refer to the facts disclosed by the evidence.

3.

The fact that an accused had been drinking or using drugs does not per se establish involuntariness of the accused's confession. All circumstances surrounding the giving of

1

the statement must be examined to determine if the intoxication prevented the accused from voluntarily making a statement.

4.

If a suspect invokes his or her right to remain silent during questioning by police, that interrogation must cease. Thereafter, the admissibility of statements obtained after the person in custody has decided to invoke his or her *Miranda* rights depends upon whether his or her right to cut off questioning was scrupulously honored.

5.

An erroneous admission of a defendant's inculpatory statements obtained in violation of his or her *Miranda* rights is subject to a harmless error analysis. Because the erroneous admission of a defendant's inculpatory statements in violation of his or her *Miranda* rights is a constitutional violation, the State has the burden of proving beyond a reasonable doubt that the error complained of did not affect the outcome of the trial in light of the entire record, *i.e.*, the State must prove that there is no reasonable possibility the error affected the verdict.

6.

When a defendant's hard 50 sentence is based solely on the fact of a prior conviction and no mitigating circumstances were presented, the sentence does not violate the defendant's right to a jury determination of guilt pursuant to *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2155, 2160-63, 186 L. Ed. 2d 314 (2013).

Appeal from Sedgwick District Court; JOSEPH BRIBIESCA, judge. Opinion filed May 27, 2016. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  A jury convicted Tyrone Walker of first-degree premeditated murder for the killing of Janis Sanders. We affirm Walker's conviction and sentence and hold: (1) any error by the district court in failing to provide a lesser included instruction was harmless; (2) the State did not err during closing argument; (3) while the district court should have suppressed Walker's statements from the interrogation after he invoked his right to remain silent, the error was harmless; (4) cumulative error did not deny Walker a fair trial; and (5) Walker's hard 50 sentence is not unconstitutional.

FACTUAL BACKGROUND

On June 4, 2011, Janis Sanders' body was discovered in the overgrown grass behind a vacant home near the intersection of Washington and Lincoln streets in Wichita, Kansas. Sanders' body was unclothed and had visible ligature wounds on the neck. Nearby, law enforcement officers found a string later identified as a shoelace and a kitchen knife stuck into the ground. Forensic analysis would later indicate that the shoelace was consistent with Sanders' neck wounds. Sanders' clothing—torn and stained with blood—along with her personal effects were then discovered in a nearby dumpster.

The investigation eventually led investigators to Charles Williams. Williams explained that he had been driving through the intersection of Washington and Lincoln the night before when a passenger in his car, Tyrone Walker, spotted Janis Sanders and demanded that Williams stop the car. Walker got out of the car and approached Sanders

3

as Williams drove away. Another passenger in the car, Suzana Hernandez, provided corroborating statements.

At trial, the jury also heard from a detective about an interview he and his partner conducted with Thomas Wilson, an inmate who had been at the Sedgwick County jail with Walker after Sanders' killing. Wilson told detectives that Walker had shared with Wilson the story of Sanders' killing, detailing the events as follows. Walker was in possession of some crack cocaine while he was riding in Williams' car. Walker spotted Sanders and decided to leave Williams and join Sanders because they had previously smoked crack cocaine together and Sanders owed him a favor. After Walker and Sanders met on the street, Sanders took them to a nearby empty house where they could smoke. During this time, Walker repeatedly propositioned Sanders for sex, but she rebuffed him. This angered Walker. He eventually pinned Sanders to the ground and told Wilson that he thought about using the kitchen knife he had with him, but because he did not want to "get blood all over himself" or leave fingerprints, he decided to strangle Sanders with a shoelace instead. Walker told Wilson that he had been concerned that Sanders had scratched him during the fighting.

Additionally, the State presented DNA evidence from three different DNA samples:  (1) scrapings under Sanders' fingernails; (2) DNA traces on the shoelace; and (3) the handle of the kitchen knife. Walker could not be excluded from any of the three crime scene DNA samples. Other forensic experts testified that the autopsy revealed bruises on Sanders' face, indicating she was beaten with "at least seven or eight distinctive, separate blows." There were at least five ligature marks on Sanders' neck consistent with repositioning, which can occur during strangulation when the victim attempts to loosen the ligature and causes the assailant to tighten the ligature in a new position. Visible scratch marks on Sanders' neck were characteristic of a victim scratching at her own neck in an attempt to move or release the ligature. The State's

expert opined that Sanders could have remained conscious for 50 to 60 seconds of struggle or possibly longer depending on the time between repositioning. The expert testified that once consciousness is lost it takes approximately 2 more minutes of pressure for irreversible brain damage to begin and approximately 3 to 4 minutes of constant pressure before death.

The jury also heard about a prior strangulation homicide committed by Walker. Walker stipulated that he was initially charged with murder in the first degree of Tamara Baker and eventually pled guilty to second-degree murder. Evidence was introduced to establish similarity between the crimes. Baker went missing on Halloween day in 1989, and her body was discovered in the spring of 1990 in a wooded area. The autopsy indicated Baker had been killed by manual strangulation. Baker's body was discovered virtually unclothed. Walker eventually confessed to investigators that he strangled Baker with his hands and then left her body in the wooded area. Walker claimed he became angry after the two had been kissing in his car and Baker told him that he needed to give her money or she would tell his wife what they were doing.

Walker now appeals his conviction and sentence.

ANALYSIS

*The district court's failure to give the lesser included instruction was not clear error.*

Walker's first claim on appeal is that the district court committed clear error by failing to instruct the jury on a lesser included crime of second-degree intentional murder. With Walker's agreement, the district court instructed the jury only on the charge of first-degree premeditated murder. The State initially argues Walker invited this error, preventing appellate review.

5

"The doctrine of invited error precludes a party from asking a district court to rule a given way and thereafter challenging the court's ruling on appeal." *State v. Soto*, 301 Kan. 969, 983, 349 P.3d 1256 (2015). If the defendant invites error in the jury instructions, the court need not determine whether the jury instruction is clearly erroneous. *State v. Jones*, 295 Kan. 804, 812, 286 P.3d 562 (2012). However, "[a] party must do more than simply fail to object to a district court's proposed jury instruction to risk application of the invited error doctrine as a bar to appellate review of that instruction." *State v. Dern*, 303 Kan. 384, Syl. ¶ 4, 362 P.3d 566 (2015).

At the instructions conference, the district court discussed with the parties its duty to instruct on lesser included crimes and opined that a second-degree murder instruction was inappropriate because the testimony on the length of time required to kill by strangulation showed premeditation. The district court then noted that Walker's counsel had not requested any lesser included instructions, and Walker's counsel confirmed that was still the case.

Under similar facts, we have regularly declined to apply the invited error rule. For example, we did not hold there was invited error in *Soto*, where the State, defense, and district court agreed there was no evidence to support lesser included instructions for the first-degree murder charge. 301 Kan. at 983-84. We noted: "[D]efense counsel made no affirmative request to omit a second-degree murder instruction nor did defense counsel decline an offer by the court to give the instruction." 301 Kan. at 984. The opinion concluded: "Defense counsel acquiesced to the trial judge's ruling rather than requested the instruction not be given. Under these facts, we decline to apply the invited error rule." 301 Kan. at 984. As in *Soto*, so too here. Walker merely acquiesced to the district court's ruling; he did not invite it.

6

Our standard of review of alleged jury instruction errors is well-established:

> "'When reviewing the failure to give a lesser included instruction, (1) first, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless.' *State v. Soto,* 301 Kan. 969, Syl. ¶ 9, 349 P.3d 1256 (2015).
>
> "When a defendant challenges the district court's failure to give a lesser included offense instruction for the first time on appeal, the reviewing court applies the clearly erroneous standard provided in K.S.A. 2014 Supp. 22-3414(3), requiring that the defendant demonstrate 'that the failure was clearly erroneous, *i.e.*, the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' *Soto,* 301 Kan. 969, Syl. ¶ 10." *State v. Cooper*, 303 Kan. 764, 769-70, 366 P.3d 232 (2016).

The State concedes that second-degree intentional murder is a lesser included offense of first-degree premeditated murder and is correct to do so. See, *e.g.*, *Soto*, 301 Kan. at 985 (intentional second-degree murder is a lesser included offense of premeditated first-degree murder). However, the parties dispute the appropriateness of the instruction in this case. We find it unnecessary to address this factual dispute because, even assuming the instruction was factually appropriate, we conclude there is no reasonable possibility the error affected the verdict. See *Cooper*, 303 Kan. at 771 (assuming the instruction was factually appropriate and proceeding directly to clear error analysis).

To establish clear error, "the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict." *Soto*, 301

7

Kan. 969, Syl. ¶ 10. Our analysis of the question in this case turns on the State's evidence of premeditation. "Premeditation means to have thought the matter over beforehand and does not necessarily mean an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation." 301 Kan. at 988-89. Circumstances giving rise to the inference of premeditation include:

> """(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. [Citation omitted.]""" 301 Kan. at 989 (quoting *State v. Kettler*, 299 Kan. 448, 467, 325 P.3d 1075 [2014]).

At trial, the State presented significant evidence supporting premeditation. In sum, the State's evidence showed Walker killed Sanders after she refused his repeated propositions for sex. Walker said he decided to strangle Sanders, despite having a kitchen knife, to avoid getting blood on himself. He used a ligature to avoid leaving fingerprints. These statements reflect a calculating, planning state of mind indicative of deliberation.

Walker strangled Sanders to death with a ligature, a process which, according to expert testimony in this case, can take 3 to 4 minutes. We have noted many times that death by strangulation presents strong evidence of premeditation. See *State v. Lloyd*, 299 Kan. 620, 634, 325 P.3d 1122 (2014); *State v. Gunby*, 282 Kan. 39, 64-65, 144 P.3d 647 (2006); *State v. Jones*, 279 Kan. 395, 403, 109 P.3d 1158 (2005); see also *State v. Scott*, 271 Kan. 103, 111, 21 P.3d 516 (2001) (when finding premeditation jury could conclude defendant's state of mind changed during the violent episode, including at any time during the strangulation); *State v. Brown*, 234 Kan. 969, 972-73, 676 P.2d 757 (1984) (evidence of premeditation sufficient when severely beaten victim was killed by strangulation). In view of the truly overwhelming evidence of premeditation here, much of it from the defendant's story as reported by Wilson, Walker has failed to firmly

8

convince us that the lesser included instruction would have made a difference in the verdict.

*The State did not err during closing argument.*

Walker next claims the State erred in closing argument by telling the jury that Sanders' body (as well as a prior victim's body) were "left like trash without dignity." Notably, Walker's brief limits its argument to these statements, and we deem any other allegations of prosecutorial misconduct abandoned. See *State v. Bowen*, 299 Kan. 339, 355, 323 P.3d 853 (2014) (arguments not adequately briefed deemed abandoned).

Specifically, Walker argues the challenged statements inflamed the passions of the jury or explained the evidence in a repugnant manner. See *State v. McCaslin*, 291 Kan. 697, 723, 245 P.3d 1030 (2011) (Prosecutor's particularly repugnant statements, despite being useful in explaining the case, were erroneous and demonstrated ill will, lack of good faith, and were gross and flagrant.); *State v. Baker*, 281 Kan. 997, 1016, 135 P.3d 1098 (2006) ("Prosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law."). We disagree.

The prosecutor's comment was made in direct response to the defense attack on Sanders' character. During closing argument, Walker's counsel chose to accuse the victim of "chas[ing] the rock by selling herself for the rock." In rebuttal, the State responded:

> "The law protects us all. We mentioned—we want to mention that she was chasing the rock. We want to mention that she was a hooker, to now attack her character that she's dead. I submit to you, you saw her at 5:15 or whatever it was that day. Someone had got her a QuikTrip. Someone had paid for that. She's barefoot, seemingly happy, and now we find her without any of this, without the things, her papers, that tell who she is.

9

She was left without her bag that she carried over her shoulder. She was—her clothes were ripped from her body and taken from her body, *so that she was left like trash*, just like Tamara Baker, just like Tamara Baker, *left like trash without dignity*." (Emphasis added.)

The first step in reviewing a claim of prosecutorial misconduct is to determine whether the statement or statements were outside the wide latitude that a prosecutor is allowed in discussing the evidence. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012). Walker relies heavily on *McCaslin*, 291 Kan. at 722-23, in which we disapproved of two comments by the prosecutor in closing argument:

"First, evidence showed that A.D.'s body was set ablaze after she was doused with citronella oil. When explaining why there was no citronella oil on McCaslin, the prosecutor argued to the jury:

"'You've all maybe lit a barbecue. Did you get barbecue lighting fluid on you when you are lighting a barbecue? No, it goes on the charcoal, and Angela Duran was his charcoal and he was through.'

"Second, when explaining to the jury why there was no soot on McCaslin's clothing, the prosecutor remarked:

"'We're not saying he hung around and cooked s'mores. We're saying he lit the fire and left. The fire was burning. You would not have soot, you would not have ash, you wouldn't have smoke at the time.'"

We found the prosecutor's statements, "while picturesque," to be "particularly repugnant." 291 Kan. at 723. We further concluded:  "[T]hese remarks not only constituted prosecutorial misconduct but also demonstrated ill will, lack of good faith, and were gross and flagrant." 291 Kan. at 723.

The prosecutor's statements here are not akin to the "repugnant" imagery we condemned in *McCaslin*. To the contrary, they came in direct response to Walker's

blame-shifting, attack-the-victim argument that specifically disparaged Sanders' character. Moreover, the State used imagery directly connected to the evidence—*i.e.*, Sanders' clothes and belongings were literally discovered in the trash and her naked body was disposed of in long grass behind a vacant house. We find these statements, in this context, to be well within the wide latitude afforded prosecutors when discussing the evidence.

*The district court erred by failing to suppress the evidence obtained after Walker invoked his right to remain silent; however, the error was harmless.*

Walker next argues the district court erred when it denied his motion to suppress the statements Walker gave to Wichita detectives. Walker claims both that he unequivocally invoked his right to remain silent under the Fifth Amendment to the United States Constitution which was violated by the continued interview and that his statements to detectives were rendered involuntary due to his alcohol consumption and sleep deprivation.

We first address Walker's claim of voluntariness or lack thereof. "When challenged, the prosecution must prove by a preponderance of the evidence the voluntariness of a defendant's inculpatory statement to a law enforcement officer." *State v. Gibson*, 299 Kan. 207, 214, 322 P.3d 389 (2014). In determining voluntariness trial courts look at the totality of the circumstances surrounding the statement by considering six nonexclusive factors: "(1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's fluency with the English language." 299 Kan. at 214. Walker claims his mental condition was impaired due to alcohol and sleep deprivation. The district court disagreed, and we find substantial competent evidence

11

supports the district court's findings. See *State v. Betancourt*, 301 Kan. 282, 290, 342 P.3d 916 (2015).

The only evidence presented at trial of Walker's actual statements to law enforcement officers from the interview was presented through the testimony of interrogating officer Detective Timothy Relph. But at the suppression hearing, both Walker and Detective Relph testified concerning Walker's mental state during the interrogation. Detective Relph testified he conducted the interview with Walker at approximately 3:19 in the morning on June 18, 2011. Detective Relph testified Walker was picked up around 11:45 p.m. and held in custody until the interview. The video of the interrogation shows Walker was alone in the room, possibly sleeping, for at least 2 hours and 40 minutes prior to the interview.

Once the interview began, Walker told Detective Relph he had 12 or 13 32-ounce cans of beer during the day before he was picked up. Detective Relph testified that Walker did not show signs of intoxication. Detective Relph acknowledged he was surprised when Walker mentioned drinking that many beers because "I certainly didn't smell it," and Walker did not exhibit signs of someone consuming that much beer. When asked if Walker displayed slurred speech, Detective Relph replied, "No. I mean, he was tired, 3:00 o'clock in the morning, but certainly didn't have any trouble recalling his relatives or anything like that." Detective Relph testified that Walker gave appropriate answers to questions and appeared to understand what was going on. While Detective Relph acknowledged that both he and Walker were sleepy, he did not observe signs of sleep deprivation.

Walker testified that he had approximately a dozen 32-ounce beers while playing cards with friends from about 1 p.m. until he was arrested at 11:45 p.m. When asked if he was under the influence of alcohol, Walker said, "It's kind of hard to say, because police

12

make you nervous, so I don't know." When asked if he was inebriated, Walker replied, "I knew I was—I don't want to say drunk, but I knew I was—I guess that's the words you want to say, yeah." Counsel then asked, "You was what?" to which Walker replied, "Buzzed, high, whatever you want. I don't know how you say it." Walker replied, "[n]o," when asked if he felt sober. Following testimony, the district court stated it would watch the interview video before ruling.

The district court denied Walker's motion to suppress, finding his statement was knowingly and voluntarily given. The court found that "it's quite apparent that [Walker] was in control of his faculties." Based on both his observations of the interview video and the testimony at the suppression hearing, the district judge found, under the totality of the circumstances, that Walker made "a knowing, intelligent, freely voluntary waiver of his rights." Notably, the court found "there is just absolutely no indication that [Walker] was under the influence of drugs or alcohol at the time of the interview."

"The fact that an accused had been drinking or using drugs does not per se establish involuntariness of the accused's confession. All circumstances surrounding the giving of the statement must be examined to determine if the intoxication prevented the accused from voluntarily making a statement." *State v. Gilliland*, 294 Kan. 519, Syl. ¶ 5, 276 P.3d 165 (2012).

> "To make this assessment, in past cases we have noted a variety of factors that provide substantial competent evidence regarding a trial court's determination that drug or alcohol use did or did not prevent an accused from making a voluntary statement. These factors have included such things as whether there were manifestations of intoxication, the opinions of those who interacted with the accused about whether the accused seemed intoxicated, the trial court's independent evaluation based on observing or hearing the accused in a video or audio recording of the statement, the accused's familiarity with the police's interview procedures, and the accused's familiarity with the

*Miranda* rights. Courts have noted markers such as whether an accused's answers were precise, normal, rational, or responsive; whether the accused was coherent and wide awake; and whether there was a detectable odor, swaying, bloodshot eyes, slurred speech, or other physical signs of intoxication. If the trial court has relied on some of these factors in ruling a statement was voluntary, an appellate court examines only whether there is substantial competent evidence to support the trial court's findings; an appellate court does not reweigh the evidence or independently reach our own determination of voluntariness." 294 Kan. at 529-30.

Applying this analysis, substantial competent evidence supports the district court's conclusion here. Detective Relph testified Walker showed no signs of intoxication. Detective Relph even found Walker's claim regarding how much he had to drink surprising given the absence of alcohol odor and the lack of signs of intoxication. Walker, for his own part, testified inconsistently, saying first, "It's kind of hard to say," whether he was under the influence but also that he was not sober.

Substantial competent evidence supports the court's decision as both the testifying officer and video of the interview show Walker was not impaired by intoxication or sleep deprivation. Accordingly, the trial court did not err in denying Walker's motion to suppress on the grounds of involuntariness.

Walker's claim that the district court should have suppressed his statements because officers violated his Fifth Amendment right to remain silent is more compelling. As a preliminary matter, both the State and Walker concede that the interview was custodial. Walker also does not challenge the facts that he was properly advised of his rights and that he initially agreed to talk to detectives. Walker argues, and the district court considered, three possible points during the interrogation when Walker may have invoked his right to end the interview.

The first alleged invocation occurred approximately 30 minutes into the interview. Detective Relph was pressing Walker on a point when Walker said, "Man, you know what, I'm done, I'm through talking, man, 'cause you gonna keep trying to talk to me and act, I mean, just ask me what you need to ask me them questions." A second detective, Detective Dan Harty, then rephrased the question, and the interview continued normally.

The second alleged invocation occurred approximately 14 minutes after the first. Detective Relph first told Walker that Williams and Hernandez had seen Walker exit the car and approach Sanders. The following exchange then occurred:

> "Walker: Well if that's what you think, then that's . . .
>
> "Relph: That's what I think.
>
> "Harty: How about . . .
>
> "Walker: How about we're done because he's just accused me of lying
>
> "Relph: Accused you of what? I didn't accuse you of lying. I told you what they said.
>
> "Walker: Okay, well.
>
> "Harty: Can I talk to you about something else?
>
> "Walker: Sure."

The interview then continued. The final alleged invocation occurred approximately 8 minutes later. At that point, Detective Relph began asking pointed questions—*i.e.*, whether Walker killed Sanders. Walker denied that he did. The following exchange then occurred:

> "Relph: You're the last person that I know that saw [Sanders] alive. Okay. The last woman you ever saw alive in 1989 is dead. Okay. I'm not so foolish to not have done my homework.
>
> "Walker: Did they tell you I was in prison for murder?
>
> "Relph: Yeah.

15

"Walker: Okay, now I'm telling you this conversation is over 'cause you just accused me.

"Relph: Yeah, I did. I think you're involved with it. [Statements overlap with Walker's]

"Walker: Okay, well, I'm done. I'm done. Now, I'm done. [Overlapping Relph's prior statement]

"Relph: Okay.

[Ten second pause in conversation occurs]

"Relph: "I asked you if you did it, that's diff. -- far different from accusing you.

[Ten second pause]

"Walker: [Directed at Relph's notes] You put down that little statement that you made just before you did that too.

"Relph: I did, because I've done my homework.

"Walker: No.

"Relph: That you were the last person that saw her. What statement do you want me to write down?

"Walker: No. None.

"Relph: That you were the last person that saw that girl in 1989? You want me to write that down too?

"Walker: [Directed at Harty] Sir . . .

"Relph: No wait, you want me to . . .

"Walker: [Directed at Harty] Can you take me to a cell now? I'll talk to you, I'll talk to the investigators, alright.

"Relph: You're gonna go to jail. You're gonna go to jail, don't worry about it.

"Harty: I understand you're getting pissed off, I mean, but the thing is is that . . .

"Walker: No, the way he does what he does. I know the good cop, bad cop, whatever, however [inaudible], it doesn't really matter like that, it's not, no no, I'm not playing no game either, what I'm saying is, there's a difference in how, we treat you at the job you do. And I understand that, you know, but, it's also . . .

"Relph: Is there a nice way to ask you that that you wouldn't have reacted that way?"

16

The interrogation continued for some time after this exchange, going approximately another hour and 40 minutes, including a 40-minute break.

> "When reviewing a motion to suppress evidence, an appellate court determines whether the factual underpinnings of the district judge's decision are supported by substantial competent evidence. The ultimate legal conclusion to be drawn from those facts raises a question of law requiring application of a de novo standard. An appellate court does not weigh evidence to find facts." *State v. Ransom*, 289 Kan. 373, Syl. ¶ 1, 212 P.3d 203 (2009).

When the material facts underlying a trial court's decision on a motion to suppress are not in dispute, the question of suppression is a matter of law over which we exercise unlimited review. *State v. Stevenson*, 299 Kan. 53, 57, 321 P.3d 754 (2014).

We have recently discussed at length the legal rules and analytical path governing Walker's claim. In *State v. Aguirre*, 301 Kan. 950, 954-58, 349 P.3d 1245 (2015), we said:

> "The rules governing an accused's constitutional rights during a custodial interrogation are well established: 'The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent.' *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003) (citing *Miranda*[ *v. Arizona*], 384 U.S. [436,] 479[, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]). Moreover, in Kansas, '[n]o person shall be a witness against himself [or herself].' Kan. Const. Bill of Rights, § 10. '[A] suspect's invocation of his or her right to remain silent must be scrupulously honored and cuts off further interrogation elicited by express questioning or its functional equivalent.' *State v. Scott*, 286 Kan. 54, 69-70, 183 P.3d 801 (2008) (citing *State v. Carty*, 231 Kan. 282, 286, 644 P.2d 407 [1982]).
> . . . .

". . . The argument is founded upon a long-standing rule of law: If a suspect invokes the right to remain silent during questioning, that interrogation must cease. *Michigan v. Mosley*, 423 U.S. 96, 100, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975) (quoting *Miranda*, 384 U.S. at 473-74). Thereafter, 'the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."' *Mosley*, 423 U.S. at 104.

"More recently, law enforcement's duty to scrupulously honor a suspect's decision to invoke his or her *Miranda* rights has been conditioned upon the suspect's ability to communicate that decision without any ambiguity or equivocation. See *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (suppression only required for denial of unambiguous invocation of *Miranda* rights; objective inquiry). This court has said that we test the clarity of a *Miranda* rights invocation by determining whether a reasonable police officer under the circumstances would understand the suspect's statement as an assertion of a *Miranda* right. *State v. Cline*, 295 Kan. 104, 113, 283 P.3d 194 (2012).

. . . .

"[O]ne potential common coloring fact is that the suspect continued to answer questions after the alleged rights invocation, as occurred here. The trial court in this case stated that it was partially influenced by [defendant's] responses to the detectives' post-invocation questions in which he said he was still willing to talk to them. But the United States Supreme Court has held 'that, under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.' *Smith v. Illinois*, 469 U.S. 91, 100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). In other words, if the interrogators simply ignore the suspect's invocation of rights and continue to ask questions, the suspect's compliance with the further questioning does not invalidate or render equivocal the prior invocation of rights."

The *Aguirre* court then reiterated that courts must "assess what a reasonable law enforcement officer under the circumstances would have understood [the defendant's] statement to mean at the time it was made." 301 Kan. at 958. We concluded that the defendant's statement, "'This is—I guess where I, I'm going to take my rights and I want

18

to turn in David to his family and I'll be back here. I mean, I would like to keep helping you guys I just want to—,'" was a facially unambiguous invocation of his rights. 301 Kan. at 960. But see 301 Kan. at 967-68 (Biles, J., dissenting) ("Given [defendant's] internally inconsistent statement about 'tak[ing] my rights' and wanting to 'keep helping' the officers, the officers quite reasonably followed up to determine whether [defendant's] concerns had to do with David or whether he intended to invoke the right to remain silent.").

Applying this analytical framework, we find that Walker's first and second alleged invocations were not unambiguous invocations of Walker's right to remain silent. In the first instance Walker said in one sentence, "I'm through talking, man, . . . just ask me what you need to ask me." By the basic language of the statement, Walker invited further questioning and did not unambiguously invoke his right to remain silent.

The second alleged invocation occurred when Walker told detectives, "How about we're done because he's just accused me of lying." Walker correctly points out that there are many instances of other courts interpreting some form of "I'm done" as unequivocally invoking the defendant's rights. See, *e.g.*, *Munson v. State*, 123 P.3d 1042, 1046 (Alaska 2005) ("'Well, I'm done talkin' then,'" invoked right to silence); *Deviney v. State*, 112 So. 3d 57, 78 (Fla. 2013) (defendant's six "'I'm done'" statements, along with attempts to leave, invoked right); *Mack v. State*, 296 Ga. 239, 242-43, 765 S.E.2d 896 (2014) ("'I'm done. I have no more to say. I'm done. Let's ride,'" invoked right); *State v. Rogers*, 277 Neb. 37, 69, 760 N.W.2d 35 (2009) ("'No, I'm not. I'm done. I won't,'" along with "'I'm not talking no more,'" invoked right); *State v. Kramer*, No. C5-00-1195, 2001 WL 604955, at *7-8 (Minn. App. 2001) (unpublished opinion) (statements such as, "(1) 'I gave you my statement' and that he wanted to go home, (2) 'I don't want to talk,' and (3) 'I'm done talking,'" unambiguously invoked the right to remain silent).

Here, however, Walker's comment was quickly followed by Detective Harty asking, "Can I talk to you about something else?" We have previously said: "[W]here a suspect makes a statement which may be ambiguous as to whether he or she is asserting a right to remain silent, the interrogator may, but is not required to, ask questions to clarify or may continue questioning without clarifying." *State v. Scott*, 286 Kan. 54, 69-70, 183 P.3d 801 (2008). Detective Harty's question, immediately following Walker's statement, was in this case an attempt to ascertain whether Walker was ending the interview. Even though appellate courts look only to the statement made, not postrequest responses, interviewing officers have also been told they may ask clarifying questions regarding ambiguous invocations. Here, Detective Harty asked for clarification, and Walker said they could talk about something else. Given this context, a reasonable law enforcement officer would not have understood Walker's statements to be an invocation of his right to end the interview.

We do find, however, that Walker unequivocally invoked his right to remain silent during the third exchange. Walker's statements, "Okay, now I'm telling you this conversation is over 'cause you just accused me," and, "Okay, well, I'm done. I'm done. Now, I'm done," demonstrate a clear and unambiguous invocation of the right to remain silent and an attempt to end the interview which is far more explicit than the previous two exchanges. A reasonable officer would view those statements as an invocation of Walker's rights. Furthermore, Walker's subsequent statements reinforce his efforts to end the interview. After Detective Relph's statement breaking the silence, and another pause, Walker directed Detective Relph to write down his "little statement" to note it happened. Finally, Walker turned to Detective Harty and asked, "Can you take me to a cell now?" Collectively, Walker's statements would have made it clear to reasonable law enforcement officers that Walker was invoking his right to remain silent under the Fifth Amendment and that they were obligated, at that point, to "scrupulously honor" Walker's request. In this respect, the district court erred in denying Walker's motion to suppress.

20

As such, any evidence of any of Walker's statements during the post-invocation portion of the interview was inadmissible.

A thorough review of the record reveals that the only evidence admitted at trial from the interview after what we have now determined to be Walker's invocation of his right to remain silent (in other words, the only evidence admitted erroneously in violation of Walker's Fifth Amendment rights against self-incrimination) was Detective Relph's testimony that Walker admitted to being in Williams' car that night but that he denied getting out of the car. It was error to allow these statements into evidence. However, at that point in the trial, other witnesses had already testified that Walker was a passenger in Williams' car, and Williams had already testified that when he had later asked Walker about getting out of the car the night of Sanders' death, Walker had outright denied getting out of the car. Thus, evidence that Walker was a passenger in Williams' car and evidence that Walker had denied getting out of Williams' car had already been permissibly presented to the jury.

Given this, the State argues that any error in the admission of Walker's statements was harmless. We agree. When a defendant's constitutional rights have been violated, the State must "carry the burden of proving 'beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict.'" *Aguirre*, 301 Kan. at 962 (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]). Given the limited evidence erroneously introduced and the fact that the evidence had already been properly presented to the jury through other witnesses, the State has met its burden.

21

*Cumulative error did not deny Walker a fair trial.*

Walker next contends that cumulative error denied him a fair trial and requires reversal. The test for cumulative error is "'whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.'" *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010) (quoting *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 12, 221 P.3d 1105 [2009]). Here, we have assumed that failing to instruct the jury on second-degree murder was error and we have determined that it was error to admit evidence obtained in violation of Walker's Fifth Amendment rights. We found both the assumed error and the actual error to be harmless. As described above, the State's evidence of Walker's guilt was overwhelming. Further, the errors were unrelated to each other and were unrelated to the ultimate question of guilt. There is no reasonable probability that, even assuming error on the jury instruction question, cumulative errors affected the verdict or denied Walker a fair trial.

*Walker's hard 50 sentence does not violate* Alleyne *because the sentence relied only on the fact of a prior conviction.*

Finally, Walker argues the trial court violated *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2155, 2160-63, 186 L. Ed. 2d 314 (2013), by imposing a hard 50 sentence based solely on the finding of the aggravating circumstance that the "defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another." K.S.A. 21-4636(a). At trial Walker stipulated to his prior conviction for second-degree murder.

Following Walker's conviction, the State filed notice of its intent to pursue a hard 50 sentence for Walker. Prior to the sentencing, however, the United States Supreme

22

Court decided *Alleyne*, calling the hard 50 sentencing system into doubt. The State filed a bench brief arguing *Alleyne* was inapplicable when a hard 50 sentence was based on the aggravating circumstance described in K.S.A. 21-4636(a), that "[t]he defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another," because prior convictions are excluded under *Alleyne* and *Apprendi*. The district court agreed and imposed a hard 50 sentence relying on Walker's stipulated-to prior conviction of second-degree murder to support the aggravating circumstance described in K.S.A. 21-4636(a).

Following *Alleyne*, we have held the hard 50 sentencing scheme in effect at the time of Walker's crime violated the Sixth Amendment to the United States Constitution because it "permitted a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt." *State v. Astorga*, 299 Kan. 395, 397-98, 324 P.3d 1046 (2014).

Citing *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), however, the *Alleyne* Court made it clear that the Constitution does not require that the fact of a prior conviction be determined by a jury. See *Alleyne*, 133 S. Ct. at 2160 n.1 (In *Almendarez-Torres*, "we recognized a narrow exception to this general rule for the fact of a prior conviction."). Walker now argues the *Almendarez-Torres* exception does not apply here because the aggravating circumstance contained in K.S.A. 21-4636(a) requires a finding of an additional "fact"—that the prior felony conviction involved the infliction of "great bodily harm, disfigurement, dismemberment or death on another."

"Interpretation of a statute is a question of law over which appellate courts have unlimited review." *State v. Morrison*, 302 Kan. 804, 813, 359 P.3d 60 (2015). At trial, Walker stipulated to his prior conviction for second-degree murder. Walker asks us to characterize as a further "factfinding" the determination that this prior felony involved the infliction of death on another. But we need not parse the statutory language that finely here, as we can comfortably conclude—as a matter of law, not factfinding—that a conviction for second-degree murder involved the infliction of death on another. Therefore, the trial court did not engage in any unconstitutional factfinding on its way to using the aggravating factor of a prior conviction to impose a hard 50 sentence on Walker.

Affirmed.