NOT DESIGNATED FOR PUBLICATION

No. 118,104

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TIPLANCE M. WALKER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed December 14, 2018. Affirmed.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., STANDRIDGE, J., and WALKER, S.J.

PER CURIAM:  A jury convicted Tiplance M. Walker of one count of intentional second-degree murder and two counts of child endangerment. Walker appeals, claiming the district court erred in finding statements she made to the police were voluntary and in denying her motion for a new trial. Finding no error, we affirm Walker's convictions.

FACTS

The facts in this case are, for the most part, undisputed. Early in the afternoon on May 17, 2015, Walker received a call from an acquaintance encouraging her to go check on her best friend, Lydia Treto.

When she arrived at Treto's house, Walker saw that Treto's face was swollen and that she had marks on her neck. Treto later told Walker that her boyfriend had choked her and threatened to kill her the previous evening. The two women discussed Treto's situation for a while and then made a trip to a local liquor store where Walker bought a half-pint of brandy and a six-pack of malt liquor. They then returned to Treto's house and continued talking while they drank the alcohol. Walker reportedly drank three of the malt liquors and, with the help of Treto, drank the entire half-pint of brandy.

After finishing the alcohol, the two women drove to another liquor store where Walker bought four 25-ounce cans of beer and another half-pint of brandy. Instead of returning to Treto's house, however, the women decided to visit their friend, Patrick Daniels, to get his perspective on Treto's situation with her boyfriend. Daniels was still at work when they arrived, so Walker and Treto hung out with his wife and continued to drink while waiting for Daniels to arrive home. When he did arrive home, however, he only stayed for a short time before leaving to buy more alcohol; specifically a pint of brandy and four 25-ounce cans of beer.

While at the Daniels' house, Walker received a call from her oldest son informing her that her four-month-old son had woken up from his nap. By this point, Walker reported that she was "buzzing" and feeling "drunk" due to her alcohol consumption. But, despite feeling this way, Walker drove to her house, picked up her two sons, and then returned with them to the Daniels' house.

Eventually, the group—Daniels, Treto, Walker, and Walker's children—decided to return to Treto's house. Once there, the group prepared some food and continued drinking. As the evening wore on, Walker and Treto began to argue about their respective boyfriends. That argument quickly escalated into a physical confrontation. Daniels tried to break up the fight but was unsuccessful. Accordingly, Daniels told Walker that she and her children needed to leave and escorted them to their car. Treto followed the group outside and positioned herself in front of Walker's car as the two continued to yell at one another. At this point, Walker climbed into the driver's seat, started the engine, and, after backing up 5 to 6 inches, slammed the car forward at such a high rate of speed that she hit and killed Treto, barreled through a chain link fence, and continued into the backyard. Walker then backed up out of the yard into the street and drove home, where she told her oldest son that the police would be coming and that he was not to tell them anything.

A short time later, at approximately 9:30 p.m., police arrived at Walker's house. After speaking with Walker, police took her into custody and transported her to the police station where they placed her in an interview room. Walker waited in that interview room for approximately three hours. During the first hour, Walker made several attempts to leave the interview room in order to determine the whereabouts of her children. Each time she tried to leave, however, Walker was met at the door by an officer who prevented her from doing so. After the first hour, police formally placed Walker under arrest and she spent the next two hours handcuffed to the interview table while waiting for her interview.

Three hours after being placed in the interview room, Detectives Michelle Tennyson and Paul Herman entered the room. The detectives began by asking Walker some introductory questions about her personal history. Walker was belligerent and at times uncooperative during this preliminary stage of the interview, but Tennyson testified Walker's answers were appropriate, and she did not exhibit any outward signs that would indicate she was under the influence of alcohol. When asked about her alcohol intake that

night and whether she felt intoxicated, however, Walker told Tennyson that she had consumed alcohol and might still be under the influence of alcohol, but would "do the best she could" to talk to the detectives. At this point, the detectives provided Walker with a form setting forth her *Miranda* rights and began reviewing with her each of the individual rights set forth on the form. Like the review of her personal history, this process took longer than usual because Walker continued to be uncooperative and refused to follow the proper procedure. Eventually, however, Walker indicated on the form that she understood her rights and was waiving them to participate in the interview. The interview lasted for over an hour, during which Walker recalled a number of details but claimed that she did not remember anything about Treto's death. When the interview was over, Walker was booked into jail and subsequently charged with one count of murder in the first degree and three counts of endangering a child.

Before trial, the district court held a *Jackson v. Denno* hearing to determine the voluntariness of the two separate statements Walker made to police: (1) those made in her home and (2) those made at the police station. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). After reviewing the evidence, the district court determined that both the statements she provided to police in her home and at the police station were voluntarily made. Nevertheless, the district court ruled that only the statements made at the police station would be admissible at trial because Walker had not been advised of her *Miranda* rights when she made the statements to police in her home.

The case went to trial, and the jury found Walker guilty of one count of the lesser included offense of intentional second-degree murder as well as two counts of child endangerment. Walker filed a posttrial motion for a new trial alleging ineffective assistance of counsel. After an evidentiary hearing, the district court denied the motion on grounds that Walker had failed to establish her attorney's performance was deficient in any way.

4

ANALYSIS

1. *Voluntariness*

Appellate courts review a district court's determination regarding the voluntariness of a defendant's statement using a dual standard of review. *State v. Gibson*, 299 Kan. 207, 215, 322 P.3d 389 (2014). "First, the factual underpinnings of the decision are reviewed under a substantial competent evidence standard. Next, the appellate court reviews the trial court's legal conclusion drawn from those facts de novo." 299 Kan. at 215-16. Notably, however, appellate courts do "not reweigh evidence, assess witness credibility, or resolve conflicting evidence." 299 Kan. at 216.

To determine whether a defendant's statement to police was voluntary (i.e., a product of the defendant's free and independent will), courts look at the totality of the circumstances and consider several nonexclusive factors:

> "'(1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's fluency with the English language.'" *State v. Walker*, 304 Kan. 441, 449, 372 P.3d 1147 (2016).

Notably, these factors are not to be weighed against one another. Rather, "'a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of the circumstances a [defendant's] will was overborne and the [statement] was not therefore a free and voluntary act.'" *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013); see also *State v. Stone*, 291 Kan. 13, 29, 237 P.3d 1229 (2010) (specifically rejecting divide and conquer approach to determinations of voluntariness and instead insisting that trial courts look to totality of circumstances).

5

Here, Walker argues that the district court erred when, after conducting a *Jackson v. Denno* hearing, it determined that the statements she made to police at her home and at the police station were voluntary. Specifically, Walker argues that (1) the statements she made at her home and at the police station were involuntary because she was intoxicated and (2) the statements she made at the police station were involuntary because the interview conditions were overly coercive.

a. *Intoxication*

Walker first argues that her mental condition (i.e., her level of intoxication) when she made her statements to police rendered them involuntary. The fact that a defendant was drinking or using drugs prior to making a statement does not, however, automatically render those statements involuntary. See *State v. Gilliland*, 294 Kan. 519, 529, 276 P.3d 165 (2012). Instead, courts must look to all of the circumstances surrounding the statement in deciding whether intoxication prevented the defendant from voluntarily making a statement, including the following:

> "[W]hether there were manifestations of intoxication, the opinions of those who interacted with the accused about whether the accused seemed intoxicated, the trial court's independent evaluation based on observing or hearing the accused in a video or audio recording of the statement, the accused's familiarity with the police's interview procedures, and the accused's familiarity with the *Miranda* rights." 294 Kan. at 529.

In addition, courts have considered "whether an accused's answers were precise, normal, rational, or responsive; whether the accused was coherent and wide awake; and whether there was a detectable odor, swaying, bloodshot eyes, slurred speech, or other physical signs of intoxication." 294 Kan. at 529.

Here, relying on a number of the *Gilliland* factors, the district court ruled that Walker's level of intoxication did not render her statements to police at her home or at the

police station involuntary. We find substantial competent evidence supports the district court's ruling.

With regard to the statements Walker made at her home, Officers Jess Bernard and Alec Eller both testified regarding the contact they had with Walker at her home shortly after Treto's death. The officers asked Walker whether she had been in a car accident and whether she had been the last person to drive her vehicle. As Walker responded to those questions, Bernard detected a slight odor of alcohol on Walker's breath and reported that Walker appeared confused but that she was not slurring her speech, did not have bloodshot eyes, and did not otherwise show any outward signs of intoxication. Eller testified that he was about 4 feet from Walker during the discussion with Walker at her home, and he did not observe any unusual behavior.

With regard to the statements Walker made at the police station, Detective Tennyson testified that she began her interview with Walker at 2:24 a.m., which meant that Walker had been in police custody and had not consumed any alcohol for almost five hours before she made her statements to police. Tennyson also testified that while Walker was at times obstinate and uncooperative, she was able to answer questions appropriately and recall details accurately. In addition, Tennyson reported that she did not detect even a slight odor of alcohol on Walker's breath and that Walker displayed none of the typical signs of alcohol intoxication. Although Walker argues the excessive amount of time it took to review the personal information and *Miranda* forms establishes she was intoxicated and unable to understand what was going on, the video of the interview supports both Tennyson's testimony and the district court's ruling in that it depicts Walker as, at times, tired, belligerent, and frustrated but at no point does it show signs of intoxication, a failure to appreciate the scope of her rights as set forth in the *Miranda* form, or an inability to understand that she was voluntarily waiving those rights in deciding to speak to the officers. After waiving her *Miranda* rights, the video of the

7

interview reflects that Walker was coherent and alert throughout the interview and her answers to the questions posed were precise, normal, rational, and responsive.

Based on the discussion above, we find substantial competent evidence supports the district court's finding that Walker's statements at home and at the police station were voluntarily made.

b. *Interview conditions*

Walker also argues, for the first time on appeal, that her statements at the police station should have been deemed involuntary by the district court based on the coercive nature of the police interview process. Specifically, Walker points to the approximately six hours that she spent in the police interview room, during which she was denied access to her children and the outside world, and argues that those conditions "affected her ability to give a voluntary statement."

But Walker's argument regarding the voluntariness of her statements at the district court focused entirely on her level of intoxication. Walker made little to no mention of her interview conditions and certainly did not assert those conditions as a separate basis for rendering her statements to police involuntary. Therefore, as the State correctly notes, Walker's claims that the interview conditions rendered her statements involuntary are not properly before this court. See *Gilliland*, 294 Kan. at 527-28; see also *State v. Engelhardt*, 280 Kan. 113, 127, 119 P.3d 1148 (2005) ("It is well established that '[t]he defendant cannot object to the introduction of evidence on one ground at trial and then assert a different ground on appeal.'").

2. *Motion for a new trial*

Walker argues the district court erred when it denied her motion for a new trial. In support of her motion, Walker argued she was entitled to a new trial because she received ineffective assistance of counsel in that counsel (1) did not investigate or pursue a defense based on mental disease or defect and (2) did not fully prepare her to testify at trial. Claims of ineffective assistance of counsel involve mixed questions of law and fact; therefore appellate courts review the district court's factual findings for substantial competent evidence and its legal conclusions de novo. *Miller v. State*, 298 Kan. 921, 928, 318 P.3d 155 (2014).

To establish a successful claim for ineffective assistance of counsel, a defendant must satisfy a two pronged test. *Chamberlain v. State*, 236 Kan. 650, 656-67, 694 P.2d 468 (1985); see also *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, the defendant must show that counsel's representation at trial was deficient. *Chamberlain*, 236 Kan. at 656. Showing deficient performance, however, requires more than simply alleging that a different strategy or tactic might have changed the outcome of the trial. See 236 Kan. at 656. Instead, a defendant must "show that counsel's representation fell below an objective standard of reasonableness." 236 Kan. at 656. Indeed:

> "Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 236 Kan. at 656-57.

If a defendant can clear this high bar, then the second prong of the test requires a showing that "the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." 236 Kan. at 656.

### a. *Mental defect*

Walker claims her counsel was ineffective for failing "to pursue a defense based on her mental condition." In support of this claim, Walker points to a 2013 report in which a psychologist diagnosed her with various clinical disorders, including bipolar disorder, anxiety disorder, posttraumatic stress disorder, panic disorder, obsessive-compulsive disorder, Asperger's disorder, dissociative disorder, several phobias, and nicotine dependence.

Walker argues these clinical diagnoses may have been relevant to show that she did not intend to kill Treto and therefore no reasonable attorney would have failed to incorporate that evidence into her theory of defense. But Walker's argument is undercut by the testimony of her trial attorney, Val Wachtel. Wachtel testified that he was familiar with both the mental disease or defect defense as well as Walker's myriad diagnoses. But after discussing it with Walker, reviewing her medical records, and carefully considering the requirements of a mental disease or defect defense, Wachtel ultimately concluded that such a defense was not nearly as likely to be successful as a voluntary intoxication defense. Given there is evidence that counsel's decision to forego a mental disease or defect defense was a strategic one made after a thorough investigation of the relevant law and facts, Walker's assertion of defective representation necessarily fails. See *Strickland*, 466 U.S. at 690 ("strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

b. *Walker's decision to testify*

Walker also claims counsel was ineffective for failing to fully advise her about the consequences of choosing to testify and for failing to prepare her for her testimony. In support of this claim, Walker points to the following exchange that occurred just before she took the stand at trial:

"MR. WACHTEL: You know, Judge, now that we are thinking about that. My first witness is going to be Ms. Walker. I think if you discussed with her the pros and cons, your usual discussions about testifying.

"THE COURT: Have you had those conversations with her?

"MR. WACHTEL: Yes, we have.

"THE COURT: You have discussed with her, her right to testify and her right not to testify, and she's made the choice to testify?

"MR. WACHTEL: And I have discussed the pros and cons and dangers of each.

"THE COURT: Okay. And all of those representations are accurate, Ms. Walker?

"[WALKER]: Yes.

"THE COURT: Do you have any questions about any of those matters?

"[WALKER]: No.

"THE COURT: Any further record would need to make on that [*sic*]?

"MR. WACHTEL: Just one last question. Have I pressured or compelled you to testify in this case?

"[WALKER]: No."

At the hearing on Walker's motion for a new trial, Wachtel testified that he generally discussed with Walker the possible ramifications of taking the stand, including that the State could cross-examine her, but did not discuss specific topics. Walker argues that failure to discuss specifics constituted deficient representation by Wachtel. We disagree. The substance of Walker's colloquy with the district court in conjunction with Wachtel's testimony at the evidentiary hearing reflects that Wachtel adequately apprised Walker of the implications and possible ramifications of exercising her right to testify.

11

That she apparently regrets doing so now does not render Wachtel's actions unreasonable nor does it render his representation deficient. Having failed to establish deficient representation, we affirm the district court's decision denying Walker's motion for a new trial.

Affirmed.