No. 119,460

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN LEE BROWN,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 2019 Supp. 60-455(a) and (b) allow the State to admit prior crimes evidence for the purposes of showing some material fact including, motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. But this is not an exclusive list. Evidence of a defendant's prior crimes may be admitted to show why a victim delayed reporting a defendant's sexual abuse.

2.

In analyzing the admissibility of K.S.A. 60-455 evidence, the district court uses a three-part test while appellate courts use the following standards of review: First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court. Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion. Third, if the fact to be proven is material and the evidence is relevant to prove

1

a disputed material fact, the district court must determine whether the risk of undue a prejudice to the defendant substantially outweighs the probative value of the evidence. The appellate court reviews this determination for abuse of discretion.

3.

In evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence.

4.

In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct.

5.

There are at least three types of prejudice resulting from the admission of prior crimes evidence: First, a jury might well exaggerate the value of other crimes as evidence proving that, because the defendant has committed a similar crime before, it might properly be inferred that he or she committed this one. Second, the jury might conclude that the defendant deserves punishment because he or she is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt in the prosecution at hand. Third, the jury might conclude that because the defendant is a criminal, the evidence put in on his or her behalf should not be believed.

6.

The erroneous admission of K.S.A. 60-455 evidence is subject to review for harmless error under K.S.A. 2019 Supp. 60-261. Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is grounds for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.

7.

Where an error in the admission of K.S.A. 60-455 evidence occurs, the party benefitting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless.

8.

In analyzing joinder or consolidation issues, the district court and appellate courts use a three-step analysis with the following standards of review: On the first step, the court determines whether K.S.A. 22-3202 permits joinder. Under that statute, multiple complaints against a defendant may be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint: (1) the charges must be of the "same or similar character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. On the second step, because K.S.A. 22-3202(1) provides that charges *may* be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion. On the third step, if an error occurred in the preceding steps, courts

3

determine whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. On appeal from a denial of a motion to sever, the party benefitting from the error is responsible for demonstrating there is no reasonable probability the error affected the trial's outcome considering the entire record.

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed August 21, 2020. Reversed and remanded with directions.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., BUSER, J., and BURGESS, S.J.

BUSER, J.: Steven Lee Brown appeals his convictions for two counts of rape, one count of attempted rape, one count of aggravated indecent liberties with a child, and one count of intimidation of a witness. Brown raises four claims of error. First, he alleges the district court abused its discretion by admitting in evidence two incidents of domestic violence under K.S.A. 60-455. Second, Brown asserts the district court erred in consolidating for trial the information alleging sex crimes with a separate information alleging intimidation of witnesses. Third, he contends the district court erred by denying three motions for mistrial. Fourth, Brown claims the multiple trial errors, considered together, constitute cumulative error requiring reversal of the convictions.

Upon our review, we hold that individually and collectively the admission of K.S.A. 60-455 evidence and consolidation of the informations for trial substantially prejudiced Brown and denied him a fair trial. Accordingly, we reverse the convictions and remand with directions to sever the two cases and for further proceedings in separate trials.

4

FACTUAL AND PROCEDURAL BACKGROUND

On November 30, 2015, Brown was arrested and later charged in an amended information with three counts of rape in violation of K.S.A. 2014 Supp. 21-5503(a)(3) and (b)(2) and one count of aggravated indecent liberties with a child under the age of 14 in violation of K.S.A. 2014 Supp. 21-5506(b)(2)(A). The State alleged these offenses were perpetrated on Brown's stepdaughter, K.N., during a seven-year period. Depending on the particular offense, K.N. (whose year of birth is 1999), was 9 years to 16 years of age when she was sexually assaulted.

While Brown was incarcerated awaiting trial on the sexual assault charges, he wrote a letter to K.N.'s mother and his longtime companion, A.N. As a result, the State filed another information charging Brown with aggravated intimidation of a victim (K.N.), in violation of K.S.A. 2016 Supp. 21-5909(a)(1) and (b)(4), and one count of intimidation of a witness (A.N.), in violation of K.S.A. 2016 Supp. 21-5909(a)(1). Over Brown's objection, the two informations were consolidated for trial.

The jury trial began on January 29, 2018. K.N. testified that Brown came into her life in 2008 when she was eight years old and he began dating her mother, A.N. Later, Brown moved into the home of A.N. and K.N. At first, K.N. and Brown had a close relationship as she considered him a father figure. When K.N. was nine years old, Brown began to sexually touch her. About that time, A.N. and K.N.'s aunt, M.N. noticed that K.N.'s demeanor towards Brown changed—K.N. suddenly wanted nothing to do with Brown.

K.N. testified the sexual abuse was ongoing over the years, beginning in February 2009. The abuse happened frequently in the beginning—sometimes twice a week—but less and less over time. In the beginning, it would happen at night and always in K.N.'s bedroom.

5

On one occasion, K.N. explained that she awoke in her bedroom in the middle of the night as Brown put his finger inside her vagina. Brown then moved K.N.'s hand to his erect penis and made her grip it. After a while, Brown left her bedroom. K.N. recalled that after the assault her vagina burned, and the next day she noticed spots of blood on her underwear.

On another occasion, when K.N. was 10 years old, she remembered Brown picking her up, carrying her to the bed and, with the covers over them, unbuttoning her pants, rubbing her vagina, and inserting his finger inside. Immediately thereafter, K.N. went to the bathroom. According to K.N., Brown followed her into the bathroom, put his hands up her shirt, and squeezed her breasts while pretending to hug her.

On a third occasion, K.N. was lying in bed and Brown came and laid down beside her. Brown moved his hand from K.N.'s breast to undo her pants. When Brown's hand reached her pubic area, K.N. started to cry. She told Brown to stop. K.N. testified that, on this occasion, Brown did not actually penetrate her vagina. After the encounter, Brown said in a threatening way that she "better not tell [her] grandma or [her] mom about what had happened."

K.N. testified that when she was 12 years old, she was lying on a bed in the living room when Brown cuddled up next to her and attempted to unbutton her pants. K.N. testified that she "kind of freaked out and said no and [she] ran to [her] bedroom and locked the door." According to K.N, when she was 14 or 15 years old, she awoke on 10 to 15 times with Brown either in her bed or on the couch with Brown's hand under her shirt and bra as he grabbed her breasts.

The last incident occurred when K.N. was 16 years old. On that occasion, K.N. again awakened to find Brown's arms around her. According to K.N., When she tried to

6

force Brown's hand off her, he pretended that he was asleep and said, "[A.N.], [A.N.]" Brown quickly got up and left the room.

K.N. testified that she did not tell her mother about the sexual assaults because she was "scared to say something. And I didn't really understand what was going on I guess." However, when she was 14 years old, K.N. told some friends about the sexual assaults, including J.M. J.M. testified that K.N. told him her stepfather "fingered" her and groped her. When she was 16 years old, K.N. confided to her father that Brown molested her when she was younger but she did not want him to tell A.N. because K.N. "had it under control, [she] was safe, everything was fine."

When K.N. was 15 years old, A.N. accompanied her to counseling sessions because K.N. had thoughts of suicide. During these joint sessions, K.N. did not tell Angela O'Brien, a crisis therapist with Central Kansas Mental Health, or her mother about the sexual abuse. After K.N. reported the sexual abuse to law enforcement authorities, she also told O'Brien. O'Brien testified that K.N. said the sexual abuse lasted for a five-year period, and she appeared relieved after her disclosure. According to the therapist, K.N. felt guilty about not disclosing it earlier.

In November 2015, when K.N. was 16 years old, she was watching a television program about molestation with her grandmother, G.S. At that time, K.N. revealed that she had been molested by Brown. G.S. exclaimed, "I knew it, I knew it." G.S. told K.N. that she needed to tell her mother, but K.N. resisted because she believed it would hurt her. G.S. told A.N. the next day, and a police report was filed.

Brown testified in his own defense at trial. He stated that he was "shocked and surprised" when he first learned of K.N.'s allegations. Brown denied committing any of the sexual assaults. He claimed it was possible that he was in the same bed or on the couch with K.N., but "just as family, nothing like sexual like they were describing."

7

Brown's trial testimony denying any wrongdoing was similar to statements he made to Detective Amanda Londono who interviewed him as part of the police investigation.

Regarding the intimidation of a witness charges, Brown testified that the letter he mailed to A.N. was never intended for K.N. Brown stated he wrote the letter because he did not have a chance to speak with A.N. about the allegations or tell her that he did not sexually abuse K.N. Brown testified that his comments about the allegations in the letter were an attempt to understand the situation.

After a five-day trial, the jury found Brown guilty of two counts of rape, one count of attempted rape, one count of aggravated indecent liberties with a child, and one count of intimidation of a witness (A.N.). Brown was acquitted of one count of aggravated intimidation of a victim (K.N.). Brown was sentenced to a controlling prison term of life imprisonment with no parole eligibility for 1306 months plus 162 months.

Brown filed a timely notice of appeal.

ADMISSION IN EVIDENCE OF PRIOR ACTS OF DOMESTIC VIOLENCE

On appeal, Brown claims the district court erred in admitting K.S.A. 60-455 prior crimes evidence. The evidence showed that in 2010 and 2011, following arguments with A.N., Brown became angry and damaged property within the home and vehicles parked outside. While the evidence was admitted to prove one reason K.N. delayed reporting her sexual abuse—fear of Brown's anger, violence, and unpredictability—Brown contends that "any limited probative value was far outweighed by its prejudicial effect." Brown also asserts this error was not harmless but reversible.

The State counters, "[t]he court concluded that the evidence that the alleged victim was scared to report was relevant to the basis for her fright, and was material. . . . The

8

court held the prejudicial effect of the domestic violence incidents did not outweigh its probative value in this type of case."

Analysis of this issue requires a thorough summary of the evidence presented by the State to prove the two prior crimes and the district court's weighing of the probative value of that evidence in relation to its potential to prejudice Brown's right to a fair trial.

*Motion and Hearing Regarding K.S.A. 60-455 Evidence*

The State filed a pretrial motion under K.S.A. 60-455 seeking to admit evidence of Brown's 2010 and 2011 property damage crimes involving A.N. The defense filed a motion in limine to prevent the admission of the evidence. In the September 19, 2010 incident, Brown and A.N. had an argument over "'dissatisfaction with their relationship.'" According to the State, during the argument, Brown significantly damaged the interior of the home. A.N. left the home and called the police, although she said that she later declined to press charges.

After the incident, K.N., who was 10 years old, was interviewed by Officer Greg Jones. According to the State's brief filed in support of the motion:

> "She said that she was in the back bedroom and did not see anything but she heard what happened. Off. Jones asked her questions about the defendant's temper, how he treated her mother and whether she had any concerns about her own safety. She continued to state that she did not see anything and that she was not afraid to remain in the home. She said that Steven [Brown] sometimes treats her mother poorly, but he has never hit or pushed her. She said that Steven was not mean to her."

Regarding the August 7, 2011 incident, the State asserted that Brown and A.N. had "an argument over their relationship and she was trying to leave him." Brown "'went crazy'" and began breaking out the windows and denting the exteriors of two motor

9

vehicles used by A.N. Then A.N. fled the scene and called police. According to the State, during this incident K.N. was inside the residence and "was able to hear all of the damage occurring outside. She was not interviewed. She was 11 years old at the time."

In the K.S.A. 60-455 motion, the State provided numerous reasons why K.N. delayed disclosure of the sexual abuse. According to the State:

> "K.N. did not report the sexual abuse earlier because:
> - o "She did not want to take a father away from her younger siblings. She had grown up without the presence of her biological father. She did not want to hurt her family.
> - o "She was afraid of what the defendant might do if she told.
> - o "She did not want to say anything to upset her mother.
> - o "She was scared to tell.
> - o "[Brown] had been in and out of jail so many times, she hoped he would eventually be out of the home for good.
> - o "The abuse had tapered off when she was about 12 years old. However, recently, he had not touched her vagina, but she would wake up with the defendant in her bed with his arms around her and she was afraid the touching would start again.
> - o "The defendant told her not to tell her mother or her grandmother."

The State asserted: "The episodes of domestic violence with her mother are relevant to her fear. K.N. was a witness to domestic violence. These cases are directly relevant as to why she did not tell: she was afraid of what [Brown] could do to her mother and their property."

In the hearing on the State's motion, defense counsel countered:

> "Your Honor, this evidence is highly prejudicial against my client. Focusing on the domestic violence issues, first of all this is a case involving aggravated indecent

liberties with a child and rape; it does not focus on domestic violence. And I believe that from what I've read in the preliminary hearing transcript, the child has never raised that she was even physically abused by my client, that she was ever threatened physically by him, that he ever slapped her, manhandled her, or anything in that regard. The incidents that the State wants to bring up are incidents the child did not witness, the child had heard, the child had heard furniture being broken had heard the windows in the vehicle being broken, was aware these things were going on. . . . Those seem very remote for the child. They're going to paint my client as a complete jerk to the jury. That's about the only way I can phrase that. The jury hears about evidence that he was in a . . . domestic relationship with the child's mother that was very full of chaos, basically, and that there was that type of physical violence. Even though it wasn't directed at [A.N.], it was directed at furniture and directed at the car. We can state to the Court that the value of that evidence is—the prejudice that's going to be . . . given by the jury toward Mr. Brown is going to outweigh any value of that. The State's theory is that well there's all this domestic violence, that's why she was afraid to report, I mean that's just a theory."

In granting the State's motion, the district court found the K.S.A. 60-455 evidence to be material and relevant as to why K.N. delayed reporting her sexual abuse. Moreover, the district court concluded, "any prejudicial effect of the domestic violence incident, that does not outweigh the probative value that took place in this type of case." The district court indicated it would issue a limiting instruction at trial.

*K.S.A. 60-455 Evidence Admitted at Trial*

Brown renewed his objection to admission of the prior crimes evidence at trial, and the district court granted defense counsel a continuing objection to the challenged evidence. Brown also objected to admission of the evidence in posttrial motions.

At trial, numerous witnesses testified to one or both prior crimes. Greg Jones, the police officer who responded to the 2010 incident testified about responding to the scene, observing damage, interviewing A.N. and K.N., and taking photographs. Seven

11

photographs depicting property damage were admitted in evidence. Officer Jones testified to damaged property shown on each individual photograph.

On cross-examination of Officer Jones, the following colloquy occurred:

"Q. And you asked [K.N.] a few specific questions, didn't you?

"A. I asked her several questions in regards to Steven's temper, the way he treats their mother, and any concerns for her own safety.

"Q. And she told you that she felt like Steven maybe didn't treat her mom the best at times but had never hit or pushed her?

"A. Correct.

"Q. She said that Steven wasn't mean to her?

"A. That's what I have in my report.

"Q. Okay. Did that indicate Steven wasn't mean to mother, or Steven wasn't mean to [K.N.]?

"A. I'm not sure.

. . . .

"Q. You asked her if she felt safe staying at the house?

"A. Correct.

"Q. And she told you what?

"A. That she did.

"Q. And she specifically said she wasn't afraid to stay there?

"A. I have that she said she was not afraid to stay at the house.

"Q. So you gave her at that point every opportunity to tell you if she was concerned about being there, concerned about Steven for any reason, correct?

"A. Correct."

A.N. also testified about the 2010 incident. She described the argument and the property that Brown had damaged and her call to the police. She believed K.N. was asleep in a back bedroom during the incident. After Brown's arrest, A.N. testified that K.N. told her she was afraid and scared. A.N. declined to press charges, and Brown continued to live at the residence.

A.N. also testified about the 2011 incident. According to her, after an argument with Brown wherein she told him to leave the residence—which he did—she went to bed only to be awakened in the middle of the night by Brown who wanted to continue the argument. At the time, K.N. was in her bedroom. Brown ordered A.N. to leave the home and as she headed for the door, he grabbed her purse and threw it at the television, breaking it. When A.N. entered her car, Brown threw bricks at it breaking the windows. When A.N. attempted to leave in another car, Brown threw bricks at that vehicle as well, breaking the windows and damaging the exterior. A.N. fled on foot, called the police, and Brown was arrested. According to A.N., she spoke with K.N. after the incident and K.N. was scared and afraid. The district court admitted a one-page handwritten statement by A.N. about the incident which she provided to the Salina Police Department.

The grandmother testified briefly to her knowledge about the 2010 and 2011 incidents.

Officer Kyle Tonniges testified about his investigation of the 2011 incident. The officer described the damage to the two cars. Officer Tonniges also testified about 18 individual photographs admitted in evidence that showed the damaged property. The officer interviewed Brown, who smelled of alcohol, at the scene. Brown told Officer Tonniges that he was upset with A.N. and asked her to move out of the house. Brown was arrested at the scene. K.N. was not interviewed about her knowledge of the incident.

K.N. testified to both the 2010 and 2011 incidents. Regarding the 2010 incident she recalled that she was 10 years old and was in her room at night watching television when she heard yelling and things breaking. She observed damaged items inside the house and recalled talking to a police officer. According to K.N. she remembered telling the officer she was okay. K.N. testified that she was worried for her mom and she felt that Brown "was just a violent person."

13

Regarding the 2011 incident, K.N. testified that she was 11 years old and watching television in her room late at night when she heard a commotion involving Brown and A.N. She also heard the noise of glass breaking outside their home and police sirens. K.N. later observed that the family's two cars had been damaged. According to K.N., she, her younger sister, and her mother stayed with a friend for several months thereafter.

At trial, K.N. testified to several reasons why, over the years, she did not report Brown's sexual abuse. As detailed by the State in their appellate brief:

> "[K.N.] testified as to the reasons for her delayed reporting. When asked why she didn't tell her mother or anyone, she said: 'I was just scared to say something. And I didn't really understand what was going on I guess.' K.N. was asked why K.N. disclosed in November of 2015. She responded: 'There were multiple reasons, and before that I did not want to come out about it because I did not think that it would ever, I never wanted anybody to find out.' She was asked why she didn't tell when she was little and she testified: 'Well I was scared of what he might do. I was scared that my mom wouldn't believe me.' She also testified she was worried about her sisters and brother. K.N. disclosed first to her grandmother. Her mother was still living with the defendant at the time of the disclosure."

K.N. testified that immediately after the police interviewed her, she explained to her aunt, M.N., the reasons why she delayed in disclosing the sexual assaults:

> "She said that she never told because she felt bad for, one, that when she would look at her baby sister she didn't want to take her dad away from her because she knew what it was like to not have her dad around. And then she also said that she didn't tell because she was afraid of not being believed, and that it would get worse, and she knew that how Steven could be, because she would see how he was with [A.N.]."

In his defense at trial, Brown admitted to the 2010 and 2011 property damage crimes. According to Brown, he pled guilty to both charges arising from the incidents.

14

The district court gave the jury a limiting instruction regarding the K.S.A. 60-455 evidence. It read:

> "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crimes charged. If considered by you at all, it may be considered solely as evidence relating to delayed reporting by [K.N.] and for no other purpose."

*Standards of Review and Brief Summary of K.S.A. 60-455 Law*

In analyzing the admissibility of K.S.A. 60-455 evidence, the district court uses the three-part test enunciated in *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006), *as modified by State v. Campbell*, 308 Kan. 763, 423 P.3d 539 (2018), while appellate courts use differing standards of review:

> "'First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.
>
> "'Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.'" *State v. Haygood*, 308 Kan. 1387, 1392, 430 P.3d 11 (2018) (quoting *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 [2014]).

Of particular importance to the case on appeal, the third part of the test used by the district court and the corresponding standard of appellate review provides that if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, the district court must determine whether the risk of undue prejudice to the defendant substantially outweighs the probative value of the evidence. The appellate court reviews

15

this determination for abuse of discretion. *State v. Thurber*, 308 Kan. 140, 202, 420 P.3d 389 (2018); see also *State v. Satchell*, 311 Kan. ___, 466 P.3d 459, 464-65 (2020) (clarifying that despite prior shorthand references omitting the word "substantially," that the risk of undue prejudice must "substantially outweigh" the probative value of the evidence).

The admissibility of all evidence of other crimes and civil wrongs is governed by K.S.A. 60-455. *Haygood*, 308 Kan. at 1392. The statutory language of K.S.A. 60-455(a) and (b) allows a party to admit prior crimes evidence for the purposes of showing some material fact including, "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." But this is not an exclusive list. *Gunby*, 282 Kan. at 56. Of special relevance to this case, our Supreme Court has allowed the admission of prior crimes evidence to show why the victim delayed reporting the defendant's sexual abuse. *State v. McCune*, 299 Kan. 1216, 1228, 330 P.3d 1107 (2014) ("[T]he State here appropriately introduced the prior sexual and physical abuse of A.R. and her family to show that A.R.'s failure to disclose the Lenexa rapes arose from a legitimate fear McCune would injure or kill her family.").

On appeal, Brown does not challenge the materiality or relevancy of the prior crimes evidence or whether the delay in K.N.'s reporting of her sexual abuse was a disputed issue at trial. As a result, we will not review the first and second steps of the K.S.A. 60-455 analysis. Instead, Brown complains about the third step in the analysis: "The court erred in admitting the evidence because any limited probative value was far outweighed by its prejudicial effect."

Our court

"reviews for abuse of discretion a district court determination that the probative value of evidence outweighs its potential for producing undue prejudice. A district court abuses its

16

discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. [Citation omitted]." *State v. Boysaw*, 309 Kan. 526, 539, 439 P.3d 909 (2019).

Our Supreme Court recently articulated a framework for analyzing whether K.S.A. 60-455 evidence was more probative than prejudicial:

> "'In evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct.'" *State v. Claerhout*, 310 Kan. 924, 930, 453 P.3d 855 (2019) (quoting *Boysaw*, 309 Kan. at 541).

*Analysis*

At the outset, the State does not favor us with any citation to the record where the district court engaged in any particularized weighing of the probative value and prejudicial effect of the prior crimes evidence. Our review of the record shows the district judge simply stated:

> "I see the—a nine-or ten-year-old child listening to and being part of, just based on presence in the home, to violent outbursts by a stepfather-type figure. . . . [T]hat would arguably be a basis to be scared of that individual and justification for delayed reporting, at least an argument to be made. *And any prejudicial effect of the domestic violence incident, that does not outweigh the probative value that took place in this type of case.*" (Emphasis added.)

In *Claerhout*—as in the case on appeal—our Supreme Court was presented with a situation where the district court "conducted a generalized, superficial weighing of the probative value of the evidence against the potential for undue prejudice, making the conclusory determination that 'the probative value of the evidence outweighs its prejudicial effect.'" 310 Kan. at 930. The Supreme Court, in *Claerhout,* found that

> "the district court's stated reasoning was so abbreviated that we cannot determine what factors, if any, it considered in reaching its conclusion that the probative value outweighed the potential prejudicial effect. To be sure, the *Boysaw* factors are not exclusive or all-encompassing, but the district court skirted carrying out its duty to protect a defendant from undue prejudice." 310 Kan. at 930-31.

Ultimately, our Supreme Court in *Claerhout* held that "[r]eversible error does not necessarily result in failing to weigh various factors on the record," and that "any deficiency in the analysis was harmless." 310 Kan. at 931.

Similarly, in *State v. Alvis*, No. 116,575, 2017 WL 6546615, at *3-4 (Kan. App. 2017) (unpublished opinion), *rev. denied* 308 Kan. 1596 (2018), our court analyzed whether the district court's failure to particularize its weighing of the probative value and the prejudicial effect of K.S.A. 60-455 evidence was error. We concluded that the landmark opinion in *Gunby*, 282 Kan. at 56-57, required a particularized weighing, and "[s]ince the district court did not particularize its weighing of the probative value against the prejudicial effect, the district court erred in admitting evidence of [the defendant's] prior bad acts." 2017 WL 6546615, at *4.

In the case on appeal, the district court's failure to state on the record the relevant factors it evaluated and the reasons undergirding the weighing of the probative and prejudice calculus frustrates appellate review. But while our Supreme Court in *Claerhout* encouraged future district courts to weigh the *Boysaw* factors on the record, it also stated that reversible error does not necessarily result from failing to weigh those factors on the

18

record. *Claerhout*, 310 Kan. at 930-31. As a result, although the district court's omission was error, standing alone, under current Supreme Court jurisprudence, it was not reversible error.

Next, employing the *Boysaw* factors, we weigh the probative value of the evidence and the prejudicial effect. Was the K.S.A. 60-455 evidence probative? Employing the *Boysaw* analytical framework—first, the prior crimes were undisputed. It was conclusively proven that the prior crimes were committed while K.N. was in the home, considerable property was damaged, the police were called, and Brown pled guilty on both occasions. This factor favors admission of the evidence.

As to the second *Boysaw* factor, we question the probative quality of the two domestic violence incidents in proving that the reason K.N. delayed reporting her sexual abuse was because of her fear of Brown's violent tendencies. Although the State premised admission of the K.S.A. 60-455 evidence on this basis—inexplicably—K.N. was never asked and never testified that she delayed disclosing her sexual abuse because of her knowledge of Brown's violent behavior that he exhibited during the 2010 and 2011 incidents. Additionally, no witness testified that K.N. ever attributed the delay in disclosing her sexual abuse to either or both prior incidents.

Moreover, a comparison of the charging periods for the individual counts alleged in the fifth amended information with the dates of the two prior crimes raises questions as to whether the two prior crimes had occurred prior to some of the rapes. For example, the rape alleged in Count 1 occurred before either of the prior crimes. Given the 19-month charging period for the rape alleged in Count 2, it may have occurred before the 2010 incident but definitely occurred before the 2011 incident. And given the 31-month charging period for the rape alleged in Count 3, it may have occurred before both prior crimes.

In summary, the probative quality of admitting the K.S.A. 60-455 evidence was diminished because, given the offense date of the 2009 rape and the multiyear charging periods of the other rape and attempted rape, there is a real question whether the sexual assaults occurred months or years *before* the 2010 and 2011 domestic violence incidents. As a result, an important question is raised regarding whether the prior crimes dissuaded K.N. from disclosing the rapes at or about the time the sexual assaults were committed. This, in turn, weakened the probative value of the K.S.A. 60-455 evidence, especially because K.N. never testified that the 2010 and 2011 incidents played any role in her delayed disclosure of the sexual assaults.

Additionally, given K.N.'s responses to Officer Jones' questions immediately after the 2010 incident, there was first-hand evidence that the incident apparently did not cause her to fear Brown's violent tendencies. Lastly, both prior acts involved property damage following a domestic dispute with A.N. K.N. was not the subject of or involved in the disturbance or harmed during either incident. In short, the second *Boysaw* factor reveals the fragile probative quality of the prior crimes evidence.

Regarding the third *Boysaw* factor, the reason K.N. delayed her disclosure was disputed. This fact would ordinarily tend to support the necessity of admitting K.S.A. 60-455 evidence. In this case, however, the dispute was not whether K.N. delayed her disclosure because the sexual assaults never occurred versus whether K.N. had a credible reason to delay her disclosure. Rather, as detailed earlier, the State presented some evidence to support many different reasons why, over the years, K.N. delayed disclosure of the sexual abuse. Yet, the *only* basis which the State focused on and presented extensive evidence at trial was the claim that K.N. did not report her abuse because of Brown's violent behavior during the 2010 and 2011 incidents. Given the myriad of seemingly valid reasons to explain K.N.'s delay in disclosure over the years, the necessity to admit prior crimes evidence as to only one reason was lessened.

20

The fourth *Boysaw* factor regarding the evaluation of the probative quality of the K.S.A. 60-455 evidence is whether the government can obtain any less prejudicial evidence. Apart from evidence about the two prior crimes, K.N. testified to one occasion when she told Brown she wanted him to stop the sexual assault. Although Brown stopped, he told K.N. that she "better not tell [her] grandma or [her] mom about what had happened." K.N. testified that she understood that Brown meant it in a threatening way. K.N. also testified that when she was young, she "was scared of what he might do."

Although K.N. testified about how her fear of Brown caused her to delay reporting, proof of the prior crimes was potentially probative of providing factually based corroboration of K.N.'s belief in Brown's violent behavior. Could the district court have weighed the limited probative quality of the prior crimes evidence while restricting the scope and extent of the more prejudicial aspects of its proof?

We believe the answer is yes. K.N., A.N., Officer Jones, Officer Tonniges, and G.S. all testified about their knowledge of the prior crimes. A.N.'s testimony (14 transcript pages), Officer Jones' testimony (10 transcript pages), and Officer Tonniges' testimony (16 transcript pages) was especially lengthy and unnecessarily detailed regarding the two incidents. Additionally, 25 photographs of damaged property were admitted in evidence and one or the other of the officers used a laser pointer while describing the damage depicted on each individual photograph. A.N.'s handwritten statement about the 2011 incident was also admitted in evidence.

Inexplicably, given this protracted and detailed testimony—ostensibly offered to prove K.N.'s fear of disclosing her sexual abuse due to her knowledge of the two incidents—K.N.'s testimony about both incidents was very brief (four transcript pages) and, as noted earlier, she never related her delay in reporting the sexual abuse to her fear of Brown based on her knowledge of the two incidents.

21

In summary, as to the fourth *Boysaw* factor relating to the nominal probative quality of the prior crimes evidence, we are convinced the State could have proven its point with considerably less testimony and physical evidence that would have mitigated the prejudice inherent in admitting extensive K.S.A. 60-455 evidence.

Was the K.S.A. 60-455 evidence unduly prejudicial? Once again employing the *Boysaw* analytical framework, we consider three factors to evaluate prejudice.

First, we consider the likelihood that such evidence will contribute to an improperly based jury verdict. Given the length and breadth of the testimony relating to the two prior crimes, we are persuaded that the exhaustive display of testimony showing that Brown on two occasions was violent and destroyed property likely established in the jury's mind that he was a general wrongdoer, a violent criminal who should not be believed when he generally denied any sexual impropriety with K.N. As a result, the unrestrained K.S.A. 60-455 evidence constituted an impermissible attack on Brown's character. See K.S.A. 60-447(b) ("[I]n a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence of the offense charged, . . . if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her character.").

Second, the extensive presentation of the prior crimes evidence was such that, rather than focus on the merits of the State's proof that Brown committed sexual offenses, the jury's attention was necessarily distracted by the details and magnitude of Brown's collateral wrongdoing. See *State v. Perez*, 306 Kan. 655, 671, 396 P.3d 78 (2017) ("The risk of undue prejudice 'turns not on whether the evidence is damaging but on whether the evidence is likely to contribute to an improper jury verdict or distract from the central issues at trial.'").

Third, as highlighted earlier, although the State could have chosen to limit the extent of its testimony and exhibits regarding the prior crimes evidence, it employed an unnecessarily time-consuming, no-holds-barred strategy, which only heightened the prejudicial effect by overemphasizing the prior crimes evidence.

In conclusion, having conducted a particularized weighing of the probative value and prejudicial effect of the prior crimes evidence, we are convinced the risk of undue prejudice to Brown substantially outweighed the probative value of the evidence. As a result, the district court abused its discretion in its admission of the State's K.S.A. 60-455 evidence to prove that K.N. delayed disclosure of her sexual abuse due to her fear of Brown's violent behavior.

Next, was the error reversible or harmless? "Admission of evidence under K.S.A. 60-455 is subject to harmless error analysis." *Claerhout*, 310 Kan. at 931; *Gunby*, 282 Kan. at 59. The erroneous admission of evidence is subject to review for harmless error under K.S.A. 2019 Supp. 60-261. Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is grounds for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. See *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018); *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). Where an error implicates a statutory right, the party benefiting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 981-82, 270 P.3d 1142 (2012).

On appeal, the State briefs one argument in support of its claim that any error is harmless, noting the limiting instruction given to the jury, and the general rule that an appellate court presumes the jury will follow the court's instructions. See *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017). The State argues: "Nothing in the record

23

suggests the jurors did not follow the instructions in reaching the verdict." For his part, Brown does not dwell on his harmless error analysis either, simply pointing out the extensive evidence admitted by the State to prove the prior crimes.

In *Gunby*, our Supreme Court recognized at least three types of prejudice resulting from the admission of prior crimes evidence:

> "'First a jury might well exaggerate the value of other crimes as evidence proving that, because the defendant has committed a similar crime before, it might properly be inferred that he committed this one. Secondly, the jury might conclude that the defendant deserves punishment because he is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt in the prosecution at hand. Thirdly, the jury might conclude that because the defendant is a criminal, the evidence put in on his behalf should not be believed.' [Citation omitted.]" 282 Kan. at 48-49.

In the case on appeal, we are persuaded that the second and especially the third type of prejudice undermines our confidence in the verdict.

The State called 5 witnesses who testified to at least 40 transcript pages of trial testimony and 26 exhibits to prove a very simple proposition—that *one* of many reasons why K.N. delayed disclosing her sexual abuse was because she was afraid of Brown. But, as detailed earlier, there were at least six other reasons the State presented why K.N. delayed her disclosure. Yet, none of these other reasons merited more than a page or two of trial testimony. Why the discrepancy in proof?

Unlike the other reasons proffered by K.N., her fear of Brown afforded the State an evidentiary gateway to highlight and overemphasize his criminal conduct in destroying property. This exploitation of K.S.A. 60-455 evidence established Brown as a repeat criminal, adversely (and improperly) affected Brown's character, and undermined his credibility in a case where the jury was presented with the proverbial "he said, she

24

said" scenario. Moreover, the evidence of Brown's guilt was not overwhelming. Not unlike most child sexual assault cases, there were no third-party eyewitnesses to the crimes and no forensic evidence implicating Brown.

Under the totality of these circumstances, we are not convinced that the district court's two sentence limiting instruction, which informed the jury that other crimes committed by the defendant "may be considered solely as evidence relating to delayed reporting by [K.N.] and for no other purpose," was sufficiently informative to mitigate the prejudice in admission of the K.S.A. 60-455 evidence. As written, the instruction did not admonish the jury to not consider—while it was deliberating the "evidence relating to delayed reporting"—that Brown was a violent criminal whose testimony, therefore, was not to be believed.

We are convinced the State has not shown there is no reasonable probability that the error affected the trial's outcome considering the entire record. See *McCullough*, 293 Kan. at 983. Accordingly, we reverse and remand for further proceedings.

CONSOLIDATION OF CASES FOR TRIAL

For his second issue on appeal, Brown contends the district court erred in consolidating for trial the information charging Brown with sex crimes against K.N., and the information alleging that Brown attempted to intimidate A.N. and K.N. from testifying in the sex crimes case. We will consider this issue because, upon remand, the issue of consolidation will arise again.

After Brown was charged with having committed the sexual abuse of K.N., he handwrote A.N. a multipaged letter from jail that was intercepted by corrections staff. At the time the letter was written, Brown had been ordered to have no contact with either A.N. or K.N. The letter was sexually graphic, recounting in detail consensual sexual

25

conduct between A.N. and Brown and, in relevant part, Brown wrote: "I thought that you would have put a stop to this shit." As a result, Brown was charged in a separate information with intimidation of a witness (A.N.) and aggravated intimidation of a victim (K.N.). Upon the State's motion, the district court ordered consolidation of the cases for jury trial.

*Motions and Pretrial Hearings Regarding Consolidation*

Prior to trial, Brown filed a motion in limine to prevent the State from, among other things, offering the letter as evidence in the sexual assault trial. For its part, the State filed a motion to consolidate both criminal cases for trial. At a hearing on the motions, Brown contended the letter was highly prejudicial regarding the sex crimes case because it contained several pages graphically discussing Brown and A.N.'s consensual sex life. In particular, given its contents, defense counsel argued the letter made the defendant appear "oversexualized . . . . an oversexed male."

In response, the State argued that "it is highly relevant to the underlying criminal sex case. . . . I think it's relevant to show his campaign of how to pressure these witnesses . . . ." The State agreed, however, that portions of Brown's letter discussing drug use during sex, prior incarcerations, possible sentences upon conviction, and plea bargaining should be redacted prior to its admission in evidence.

The district judge determined the letter was highly relevant, material, and not overly prejudicial:

> "The question really is whether that probative value that's contained in that document is substantially outweighed by its prejudicial effect. And the prejudicial effect as described by Defense counsel is really the graphic nature, description of the sex acts. The Court did consider the amount of sexual contact that was described . . . . The real issue is whether that graphic description, the profanity, the detailed description of sex acts, would be so

26

offensive to either embarrass, to show that he's, I guess, perverse [*sic*] is probably the way that Defense counsel is trying to couch it, or oversexed I think is the word, phrase that you used, the Court doesn't see that prejudicial effect outweighing the probative value. The jurors are going to be able to put that kind of conduct and comment into context . . . and give that letter the weight it deserves. . . . [T]he Court would find that the probative value through the attempt to change or dissuade a witness from testifying is relevant. Under [K.S.A.] 60-455 analysis, obviously that's another crime that's being alleged, and it would come in as to the [sex crimes] case as intent, his essentially consciousness of guilt type argument, and his motive, it would all be relevant to those factors under [K.S.A.] 60-455, and the Court is finding as to the prejudicial effect . . . which would be the next step in that analysis, and I find that the probative value is not outweighed by its prejudicial effect. And note as well that I agree with counsel that any evidence presented by the State should be prejudicial, so it's related to the amount of prejudice that the Court finds is not sufficient to eliminate its use by the State as to all counts now presented in [the sex crimes case] and [the witness intimidation case]."

The district court found that consolidation was appropriate under K.S.A. 22-3203 and K.S.A. 22-3202 because the two informations related to the same underlying conduct and witnesses. Brown's motion to reconsider was denied. He also renewed his objection to consolidation in posttrial motions.

During trial, Brown was cross-examined by the prosecutor regarding the sexual contents of his letter to A.N. Brown was questioned about why he wrote about sliding his fingers in and out of A.N.'s vagina:

> "[THE STATE:] [I]sn't that exactly what [K.N.] has described in court this week that you did do to her?
> "[BROWN:] I mean that's why I put that in the letter because . . .
> "[THE STATE:] No further questions.
> "THE COURT: Any redirect?
> "[DEFENSE COUNSEL:] Mr. Brown, why did you put that in the letter?

27

"[BROWN:] Well, I mean, I had seen the discovery or whatever, I think that's what it's called, and that's what she was claiming what I had done.

"[DEFENSE COUNSEL:] What was your point in telling [A.N.] that?

"[BROWN:] That I didn't do that to [K.N.]."

During closing argument, the prosecutor asserted that the contents of the letter were evidence that Brown committed the three rapes of K.N.:

"[THE STATE]: . . . So what is it that you infer from this letter.

"Sex, sex, sex, sex at the front part of the letter, folks. And then it gets to, after describing all of that, he says, we had great times, and this is not even half of the memories that we have shared. I [explicit] loved you [A.N.] I loved the family and that bond we shared. Now how, think about that long and hard, and would I ever do any of that to [K.N.] Think of how I used to rub your [vagina] and how I used to slide my fingers in and out of you, so forth, so on. Do you think I'd want to share any of that with [K.N.]? *Isn't it interesting that that sex act is exactly what the theory of the case is?*

"[DEFENSE COUNSEL]: Objection, Judge.

"THE COURT: Sustained.

"[THE STATE]: *Isn't it interesting that that description, what has the State charged in 1, 2, and 3*?

"[DEFENSE COUNSEL]: Objection, Judge.

"[THE COURT]: Sustained. The jury will disregard that last comment."
(Emphases added.)

After the prosecutor concluded her argument, Brown moved for a mistrial:

"[DEFENSE COUNSEL]: "The State has intentionally argued the evidence we have discussed over and over again in this case, the letter being used to find the defendant guilty of the sexual acts. After the court sustained my first objection, she continued to make those arguments asking the [jury] to use that letter to convict him of the first several counts. I understand the Court told them to disregard that. The bell is rung, you can't unring it. That is out there. And, again this was an intentional prepared argument, exactly using that offense for the purpose that it's not intended to be used.

28

"THE COURT: The State?

"[THE STATE]: Judge, I think the statement speaks for itself. . . . there's a limiting instruction about the purpose of the letter. I don't exactly even recall what I said.

"THE COURT: Well, counsel what you said, you used the paragraph in the letter where the defendant describes digital penetration between he and [A.N.], and indicates how would he think about that specific type of penetration, and his denial, [K.N.], referring he knew it because he did it before [K.N.] essentially what you were saying.

"[THE STATE]: I ask that the Court instruct the jury to disregard that.

"THE COURT: I did that already, counsel."

The district judge denied the motion for mistrial, stating, "I don't see that as so prejudicial as to require the mistrial. The jury can follow my instructions."

The district court gave the jury this limiting instruction regarding the letter:

"Evidence has been admitted tending to show the defendant was in a sexual relationship with [A.N.]. If considered by you at all, it may be considered only as evidence of the relationship between the defendant and [A.N.] when considering the offenses of intimidation of a witness and aggravated intimidation of a victim *and for no other purpose.*" (Emphasis added.)

*Standards of Review and Summary of Law Regarding Consolidation*

In analyzing joinder or consolidation issues, the district court and appellate courts use a three-step analysis with the following standards of review: On the first step, the court determines whether K.S.A. 22-3203 permits joinder. Under that statute, multiple complaints against a defendant may be tried together if the State could have brought the charges in a single complaint.

K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint: (1) the charges must be of the "same or similar

29

character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017). See *State v. Robinson*, 303 Kan. 11, 204, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016) (defining common scheme or plan).

On the second step, because K.S.A. 22-3202(1) provides that "charges 'may' be joined," a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion." *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

On the third step, if an error occurred in the preceding steps, courts determine whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. See K.S.A. 2019 Supp. 60-261; *State v. Carter*, No. 119,315, 2020 WL 3885636, at *7 (Kan. 2020); *Hurd*, 298 Kan. at 561. On appeal from a denial of a motion to sever, the party benefitting from the error is responsible for demonstrating there is no reasonable probability the error affected the trial's outcome considering the entire record. *State v. Carr*, 300 Kan. 1, 95, 331 P.3d 544 (2014), *rev'd on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); *Hurd*, 298 Kan. at 564.

*Analysis*

At the outset, on appeal, Brown does not contend that the district court erred regarding the first step of the analysis. Brown concedes that under K.S.A. 22-3203 and K.S.A. 22-3202(1) the State established the legal requirements for consolidation. As a result, we will not review whether consolidation was permissible under Kansas statutes.

30

Brown's complaint is with the second step of the analysis which asks whether the district court erred in exercising its discretion to consolidate the two informations even though consolidation was legally permissible.

In response, the State emphasizes that the two informations were, consistent with K.S.A. 22-3203, properly consolidated for trial. Moreover, the State defends the district court's consolidation ruling because Brown's prejudice argument "ignores the findings of the trial court that the letter was relevant to both cases." We question whether the letter was relevant to the sexual assault case.

Brown's one sentence in the letter—"I thought that you would have put a stop to this shit"—was obviously relevant to prove the intimidation of a witness charge against A.N. But the district court viewed the letter as also relevant to prove Brown's guilt in committing the sexual assaults. Employing a short-form K.S.A. 60-455 analysis, the district court found that the letter was "another crime that's being alleged, and it would come in as to the [sex crimes] case as intent, his essentially consciousness of guilt type argument, and his motive, it would all be relevant to those factors under [K.S.A.] 60-455."

Of note, "'Kansas caselaw and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455.'" *State v. Bates*, No. 117,419, 2019 WL 1412600 (Kan. App. 2019) (unpublished opinion) (quoting *State v. Smith-Parker*, 301 Kan. 132, 161, 340 P.3d 485 [2014]), *rev. denied* 310 Kan. 1064 (2019). Whether the letter qualified as K.S.A. 60-455 evidence relevant to the sexual assault case is of no consequence in the consolidation analysis. But whether the letter was probative to show that Brown committed one or more of the sexual assaults—ostensibly the basis for the district court's discretionary consolidation decision—is relevant to the second step of the analysis.

31

The probative quality of the letter as proof of the sexual assaults is difficult to discern. The letter states in part:

> "I [expletive] loved you, [A.N.]. I loved the family [a]nd bond that we shared. Now think long and hard do you think I would ever want to do any of that with [K.N.]? . . . How could you ever even entertain the thought of any sexual activity with [K.N.] or [names of other children]."

A fair reading of the letter reveals that Brown explicitly denied having sexual activity with K.N. Moreover, Brown's graphic recollection of consensual sex acts with A.N. was an attempt by Brown to pull on A.N.'s heartstrings and use their sexual relationship and memories about their past as a family (Brown had fathered three of A.N.'s children during their eight-year relationship) to make A.N. feel guilty about cooperating with the prosecution.

Unlike the district court, we fail to see how the contents of the letter tended to prove Brown's intent or motive to sexually assault K.N. or his consciousness of guilt in doing so. The district court's view that the letter was probative to prove that Brown sexually assaulted K.N. is not only questionable, but it also directly contradicts the limiting instruction the court provided the jury. In the instruction, the district court admonished the jury that it could only consider the letter when evaluating whether Brown committed the intimidation of witness charges "and for no other purpose."

Under the second step of the analysis, in considering whether the district court abused its discretion in consolidating the two informations, we are unable to reconcile the inconsistency of the district court's finding that consolidation was appropriate because the letter was probative evidence in the sexual assault case, yet specifically instruct the jury at trial not to consider the letter for that purpose. This inconsistency underscores the erroneous rationale for the district court's consolidation ruling. Given the letter's lack of

probative value in proving the sexual assault case, we hold the district court abused its discretion in consolidating the informations for trial.

Given this error in the second step, we proceed to the third step in the analysis and evaluate whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. See K.S.A. 2019 Supp. 60-261; *Carter*, 2020 WL 3885636, at *7; *Hurd*, 298 Kan. at 561. At the outset, the State misstates the burden of proof. The party benefitting from the error—in this case, the State—is responsible for demonstrating there is no reasonable probability the error affected the trial's outcome considering the entire record. *Hurd*, 298 Kan. at 564.

The State's prejudice argument consists of four sentences:

"The trial court found that the *letter* was relevant to both cases. The court would have admitted the letter in the [sexual crimes] case, even if the [witness intimidation case] had not been consolidated. The jury did acquit on one charge which show[s] the jury was considering each charge . . . individually and the letter did not cause the jury to convict when they otherwise would have acquitted. The Defendant cannot establish error."

Brown counters:

"The district court's error in consolidating cases was not harmless. The case against Mr. Brown for the sex crime charges was not overwhelming. With no physical corroborating evidence, the jury's verdict turned upon the credibility of the complaining witness and Mr. Brown. Without the jury's consideration of the sexually graphic letter, the likelihood of a different result is great enough to undermine confidence in the outcome of the trial."

At the outset, the district court clearly understood the "graphic description, the profanity, the detailed description of sex acts," had the potential to persuade a jury that

33

Brown was, as characterized by defense counsel, "oversexed." But the district court, noting that Brown and A.N. had an eight-year relationship, discounted the impact of the vivid consensual sex acts because "[t]he jurors are going to be able to put that kind of conduct and comment into context and see that—and give that letter the weight it deserves."

Brown disagrees with the district court's assessment of the letter's prejudicial effect. Based on the graphic contents of the letter, Brown argues that the jury viewed him "as a sexual deviant or fiend in deliberating his guilt for the child sex crime charges. As a result, the jury was much more likely to disbelieve Mr. Brown's denial and to find him guilty."

We think that Brown has the better argument. The contents of the lengthy letter vividly describing Brown and A.N.'s consensual sexual activities—laced with profanity and vulgar, disparaging terms for A.N.'s genitalia—surely placed Brown in an unfavorable light before the jury, even though his sexual activities with A.N. were consensual and irrelevant to whether he sexually assaulted K.N. The letter had the effect of improperly impugning Brown's character and giving the impression that Brown's reveling in consensual sexual behavior necessarily showed his criminal intent or motive in sexually assaulting K.N.

This prejudicial effect was only heightened by the State in cross-examining Brown and in closing argument. The prosecutor questioned Brown about his statements in the letter describing his digital penetration of A.N., and his claim that he would not engage in that particular sex act with K.N. Then, directly contrary to the district court's limiting instruction, the prosecutor noted to the jury in closing argument that Brown's description of his digital penetration of A.N. was similar to the digital penetration the State alleged that Brown perpetrated against K.N. After Brown's objection was sustained, the prosecutor immediately rephrased the question but essentially repeated it. Another

34

objection was sustained and the district court sua sponte directed the jury to disregard the question.

Like the prejudice analysis regarding the district court's admission of K.S.A. 60-455 evidence, we again observe that the evidence of the sexual assaults was not overwhelming, simply because there were no third-party witnesses or incriminating forensic evidence. One sentence of the letter tended to prove Brown's guilt of obstructing A.N. as a witness, but the remainder of the lengthy document comprising salacious details of Brown and A.N.'s sex life presented Brown in an unflattering light due to its subject matter, denigrating sexual colloquialisms, and profane language. In short, the sexual comments, while of limited probative value to prove the obstruction charges, were especially prejudicial to Brown regarding the sexual assault case. In closing argument, the prosecutor—in contravention of the district court's limiting instruction—took full advantage of this prejudice by highlighting to the jury that one aspect of Brown's consensual sexual activity was similar to the illegal sexual activity that K.N. alleged Brown had committed over many years.

We are convinced the State has not shown a reasonable probability that the consolidation did not affect the trial's outcome considering the entire record. See *Hurd*, 298 Kan. at 564; *McCullough*, 293 Kan. at 983. Accordingly, because the district court abused its discretion by consolidating the cases, and this error adversely affected Brown's substantial rights in the sexual assault case, we reverse and remand with directions to sever the two cases and for further proceedings in separate trials.

DENIAL OF THREE MOTIONS FOR MISTRIAL

For his third issue on appeal, Brown complains that the district court failed to grant a mistrial on three separate occasions. Brown first requested a mistrial when the State violated a motion in limine to exclude any reference to Brown serving time in jail or

35

prison. At trial, the State admitted a redacted recording of an interview with K.N. and M.N., which included the statement, "when [Brown] got out." The defense objected because, contrary to the State's agreement, it had failed to redact that reference in compliance with the district court's order in limine. The State admitted this error in redaction was "clear error" but argued it did not warrant a mistrial because the jury had already heard evidence about Brown's domestic violence and could infer that Brown's getting out of jail was related to those incidents. The district judge agreed there was error but denied the motion for mistrial.

The second motion for mistrial occurred when the State introduced a recording of Detective Londono's interview of K.N. and A.N. During that recording, there was mention of Brown being in court, which violated the order in limine. The defense objected, and the prosecutor conceded the error but argued it did not warrant a mistrial. The district court denied Brown's motion but found, "[t]he analysis is the same, it seems almost identical to the prior. It needs to not be in. It is error."

Brown's third motion for mistrial was made during the prosecutor's closing argument when she related Brown's description of consensual digital penetration of A.N. in the letter to K.N.'s similar description of Brown's sexual assaults. The district court found these comments, which we discussed earlier, were in error on both occasions but did not justify a mistrial.

Given our holding reversing and remanding this case it would serve no purpose to review the district court's rulings denying the three motions for mistrial. Given the State's concessions of error and the district court's findings of error on all three occasions, we are satisfied these errors will not recur upon retrial.

For his final issue on appeal, Brown contends the three trial errors considered together resulted in cumulative error requiring a reversal of his convictions and a new trial. The State does not address the errors in admission of the K.S.A. 60-455 evidence or consolidation. Instead, it responds that any cumulative errors in the district court's rulings regarding Brown's three motions for mistrial were harmless because two of the statements likely went unnoticed by the jury and the district court instructed the jury to disregard the prosecutor's arguments made during closing arguments.

Kansas appellate courts apply "a de novo standard when determining whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error." *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 (2014).

The analysis to be used when evaluating cumulative error was recently stated by our Supreme Court:

> "The test is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial under the totality of the circumstances. In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. 'No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant.' [Citations omitted.]" *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

See *State v. Walker*, 304 Kan. 441, 457-58, 372 P.3d 1147 (2016).

Preliminarily, the cumulative error rule is ordinarily applied when two or more harmless errors are collectively viewed as substantially prejudicing the defendant and denying the defendant a fair trial. In this case, we have found the admission of K.S.A. 60-455 evidence and consolidation of the two informations individually constituted reversible error and, thus, the cumulative error rule is not applicable.

Consistent with the purpose underlying the cumulative error rule, however, we pause to note how the two reversible errors we have identified, when aggregated, only heightened the prejudicial effect in denying Brown a fair trial. Together, the reversible errors acted synergistically with the end result that the jury received a substantial quantity of derogatory evidence to improperly discredit Brown, impeach his character, or at least put him in a bad light in defending the sexual assault case where the critical evidence was his testimony compared to K.N.'s testimony. Moreover, as mentioned earlier, the evidence of guilt was not overwhelming given the lack of a third-party eyewitness or incriminating forensic evidence. Whether considered singularly or together, we are convinced that Brown did not receive a fair trial.

Reversed and remanded with directions.